**CASE NO. 23-2128**

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

PAUL TRUETT CANADY, II,
Administrator for the Estate of Jimmie Andrew Underwood,
a/k/a James Blackmon, a/k/a James Blackman, a/k/a Jimmy Lee Hooker,

*Plaintiff - Appellant,*

v.

JAMES HOLDER, in his individual capacity;
ANDREW MUNDAY, in his individual capacity;
CITY OF RALEIGH,

*Defendants - Appellees.*

On Appeal from the United States District Court
for the Eastern District of North Carolina at Raleigh

### RESPONSE BRIEF OF APPELLEES

Jason R. Benton
Daniel E. Peterson
Caroline B. Barrineau
PARKER, POE, ADAMS
& BERNSTEIN LLP
Bank of America Tower
620 South Tryon Street
Suite 800
Charlotte, NC 28202
(704) 372-9000

Norwood Pitt Blanchard, III
CROSSLEY MCINTOSH
COLLIER HANLEY &
EDES PLLC
5002 Randall Parkway
Wilmington, NC 28403
(910) 762-9711

Rachel E. Keen
Sonny S. Haynes
WOMBLE BOND
DICKINSON (US) LLP
One West 4th Street
Winston-Salem, NC 27101
(336) 721-3569

*Counsel for Appellee*
*James Holder*

*Counsel for Appellee*
*City of Raleigh*

*Counsel for Appellee*
*Andrew Munday*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  23-2128          Caption:   Paul Canady, II v. James Holder, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

James Holder
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.  Does party/amicus have any parent corporations?                          ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    N/A


3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐YES ☑NO
    If yes, identify all such owners:

    N/A

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

N/A

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

N/A

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

N/A

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

N/A

Signature: /s/ Jason R. Benton _____    Date: ___11/09/2023___

Counsel for: James Holder _____

- 2 -

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-2128__      Caption: __Paul Truett Canady, II, et al. v. James Holder, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Andrew Munday__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?   ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sonny S. Haynes _____       Date: ___November 9, 2023___

Counsel for: Appellee Andrew Munday_____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-2128__       Caption: __Paul Canady v. James Holder, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__City of Raleigh, North Carolina__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                            ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Norwood P. Blanchard, III        Date: 11/9/2023

Counsel for: City of Raleigh, North Carolina

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

JURISDICTIONAL STATEMENT .............................................................1

STATEMENT OF FACTS ...........................................................................1

SUMMARY OF THE ARGUMENT ...........................................................7

ARGUMENT ...............................................................................................10

I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT HOLDER AND MUNDAY WERE ENTITLED TO QUALIFIED IMMUNITY FROM APPELLANT'S INDIVIDUAL-CAPACITY § 1983 CLAIMS, INCLUDING THOSE BASED ON ALLEGED DELIBERATE CONDUCT...............10

    A.    Appellant cannot prevail on a coerced confession claim, and he knows it ................................................................11

    B.    Appellant's cited legal authority falls short of supporting his claim that the detectives deliberately caused Blackmon to make false admissions ................................................14

    C.    There is only one decision within the geographic boundaries of this Circuit that has addressed the type of fabrication claim that Appellant attempts to assert, and Appellant has ignored it ................................................24

        1.    *Washington I* .........................................................25

        2.    *Washington II* ........................................................26

        3.    The *Washington* Appeal............................................28

D.    Appellant's factual allegations irreconcilably contradict the legal standard required for his theory of recovery under § 1983.............................................................................29

E.    Appellant's attempt at a new fabrication claim alleging that Holder and Munday attributed statements to Blackmon that he did not actually make utterly fails................................31

1.    The challenged statements were, by Appellant's own allegations, not fabricated ............................................32

2.    Alternatively, the challenged statements were not the but for or proximate cause of Blackmon's guilty plea and incarceration .......................................................34

II.    THE COMPLAINT DOES NOT PLAUSIBLY PLEAD A "RECKLESS FABRICATION AND/OR USE OF FALSE EVIDENCE CLAIM." ...........................................................37

CONCLUSION ...........................................................................45

CERTIFICATE OF COMPLIANCE ......................................................48

# TABLE OF AUTHORITIES

## Cases

*Arkansas Nursing Home Acquisition, LLC v. CFG Community Bank*,
    460 F. Supp. 3d 621 (D. Md. 2020) .................................................................. 30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................................... 14

*Brady v. Maryland*,
    373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) ...................................... 21

*Colorado v. Connelly*,
    479 U.S. 157, 107 S. Ct. 515 (1986) ........................................................... 12, 13

*Estate of Owensby v. City of Cincinnati*,
    414 F.3d 596 (6th Cir. 2005) ........................................................................... 20

*Gilliam v. Sealey*,
    932 F.3d 216 (4th Cir. 2019) ...................................................................... 16, 17

*Goines v. Valley Community Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ........................................................................... 30

*Gonzalez v. City of Waukegan*,
    220 F. Supp. 3d 876 (N.D. Ill. 2016) ............................................................... 18

*Halsey v. Pfeiffer*,
    750 F.3d 273 (3d Cir. 2014) ...................................................................... 17, 18

*Hamric v. Bailey*,
    386 F.2d 390 (4th Cir. 1967) ...................................................................... 21, 22

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ....................................................................................... 10

*Hill v. Crum*,
    727 F.3d 312 (4th Cir. 2013) ..................................................... 10, 11, 15, 21

*Howard v. City of Durham*,
    487 F. Supp. 3d 377 (M.D.N.C. 2020) ............................................................ 34

*Humbert v. Mayor and City Council of Baltimore City*,
    866 F.3d 546 (4th Cir. 2017) ...................................................................... 43, 44

*In re Livent, Inc., Noteholders Securities Litigation*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) ............................................................ 30

*Massey v. Ojaniit*,
  759 F.3d 343 (4th Cir. 2014) ............................................................ 42

*Miller v. Pate*,
  386 U.S. 1, 87 S. Ct. 785, 17 L. Ed. 2d 690 (1967) ......................................... 22

*Miller v. Prince George's Cnty. Md.*,
  475 F.3d 621 (4th Cir. 2007) ............................................................ 38

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) ............................................................ 10

*Ricciuti v. N.Y. City Transit Authority*,
  124 F.3d 123 (2d Cir. 1997) ............................................................ 15

*Sanchez v. Hartley*,
  810 F.3d 750 (10th Cir. 2016) ............................................................ 23

*Slaughter v. Mayor and City Council of Baltimore*,
  757 F. Supp. 2d 548 (D. Md. 2010) ............................................................ 20

*Spencer v. Peters*,
  857 F.3d 789 (9th Cir. 2017) ............................................................ 18

*State v. Blackman*,
  93 N.C. App. 207, 377 S.E.2d 290 (1989) .................................. 6, 11-12, 36, 39

*Washington v. Buraker*,
  322 F. Supp. 2d 692 (W.D. Va. 2004) .................................. 8, 25, 26

*Washington v. Buraker*,
  322 F. Supp. 2d 702 (W.D. Va. 2004) .................................. 26, 27, 28

*Washington v. Wilmore*,
  407 F.3d 274 (4th Cir. 2005) ............................................................ 28, 34

*Waybright v. Frederick Cnty., MD, Dep't of Fire and Rescue Servs.*,
  528 F.3d 199 (4th Cir. 2008) ............................................................ 20

*Wilson v. Lawrence Cnty.*,
  260 F.3d 946 (8th Cir. 2001) ............................................................ 19

iv

*Wilson v. Layne*,
  526 U.S. 603 (1999) ........................................................... 11

*Wilson v. Russo*,
  212 F.3d 781 (3d Cir. 2000) ............................................. 41

*Winslow v. Smith*,
  696 F.3d 716 (8th Cir. 2012) ........................................... 19

## Statutes

42 U.S.C. § 1983 ..................................................... *passim*

## Rules

Fed. R. App. P. 28 ..................................................... 1

## <u>JURISDICTIONAL STATEMENT</u>

Pursuant to Rule 28(b) of the Federal Rules of Appellate Procedure, Appellees include the following jurisdictional statement because the Appellees are "dissatisfied with the appellant's statement."

Based upon the reasoning discussed in-depth in the Appellees' Motion to Dismiss Appeal filed contemporaneously herewith and incorporated as if fully set forth herein, Appellees deny that Appellant has vested this Honorable Court with jurisdiction in this appeal. Accordingly, the Court should dismiss this appeal.

## <u>STATEMENT OF FACTS</u>

On September 29, 1979, a student named Helena Payton was attacked in a stall in the bathroom of her all-female dormitory— Latham Hall— at St. Augustine's College in Raleigh, North Carolina. (J.A.14-15, J.A.26-27.) At least one witness account indicates that the suspect who attacked Ms. Payton fled into the woods behind a dormitory adjacent to Latham Hall. (J.A.26.) Indeed, a critical piece of evidence— specifically, a bloody dashiki— was later discovered in those woods. (J.A.26.) A little over a month after the attack, Ms. Payton died from her injuries. (J.A.14-15.) The case went unsolved for several years. (J.A.15.) Multiple Raleigh Police Department officers were involved in the investigation over those years.

In February 1983, Detective Lockey of the Raleigh Police Department received a tip from a source in Dorothea Dix Hospital that an individual admitted to

Dix (*i.e.*, the state psychiatric hospital), and residing in the hospital's 302 McBride Building, had "mentioned the murder of a black female at St. Augustine College… [t]he suspect talked about murdering other black females in Wake County [North Carolina] (at least three) and at least two (2) murders in New York and New Jersey… The suspect was supposed to have been very graphic in his description of how he killed these women…" (J.A.31-32.)  The source believed the suspect's name started with the letter "B". (J.A.32.)  Lockey then "contacted a second source at Dix," who "reported that the only subject who fit the criteria was James Blackmon." (J.A.32.)  The detective learned that James Blackmon ("Blackmon") had been previously incarcerated in both Wake County, North Carolina [*i.e.*, Raleigh] and at Attica in New York.  (J.A.32.)

Subsequent to the informant's tip to their colleague, the two individually named defendants in this case, Detectives James Holder ("Holder") and Andrew Munday ("Munday"), showed an eyewitness to the murder, Jacqueline Kelly ("Kelly"), "a photo array containing a photo of James Blackmon.  Kelly pulled Blackmon's photo aside, along with the photo of a man named Barry Chavis," commenting that "these two looked like they could possibly be the suspect." (J.A.39.)

On October 25 and 26, 1983, Blackmon voluntarily met with and was questioned by Holder and Munday multiple times (J.A.44-61), during which he (1)

freely left and returned to the interviews; (2) was taken to eat at McDonalds (J.A.51); (3) was provided coffee, cigarettes, and transportation (J.A.19); (4) was free to use the restroom (J.A.53); and (5) was allowed to walk around the campus of St. Augustine's on his own recognizance. (J.A.50.)

During those interviews, Blackmon made inculpatory statements to Holder and Munday. Specifically, he (1) stated that he "will know everything" if he visits the top floor of the dormitory (J.A.54); (2) identified the stall, out of several, where the victim had been attacked (J.A.54); (3) agreed that he egressed to the woods as the suspect had in-fact done (J.A.57); and (4) agreed that the "other James Blackmon" might have been present or involved with the attack on the victim at St. Augustine's College. (J.A.57-61.)

Significantly, Appellant alleges that Holder and Munday, blinded by confirmation bias and tunnel vision, "believed Blackmon had committed the murder, which caused them to ignore substantial evidence of his innocence and to create a fabricated confession." (J.A.44.)

Holder and Munday's first recorded/transcribed interview of Blackmon occurred on October 25, 1983. (J.A. 44.) That same day, Holder and Munday visited St. Augustine's with Blackmon for the first time but did not tape record conversations with him on the way to campus, at campus, or on the way back from

campus. (J.A.44-50.) While there is no tape recording of this October 25, 1983 campus visit, Holder prepared a report concerning it. (J.A.50-51.)

After Blackmon was allowed to walk around the campus unescorted, he and the two detectives got back into the car to leave. (J.A.50.) As they left, Munday asked Blackmon if St. Augustine's looked familiar to him, to which Blackmon responded "yes." (J.A.50.) Next, Munday stopped the vehicle, Blackmon exited and walked into a wooded area where he disappeared out of the detectives' sight, and then returned, stating "there is evil down there, and bad spirits." (J.A.51.) According to Holder, as the three drove by Latham Hall to leave campus, Blackmon stated "that's the girl's dorm … I have been there before." (J.A.51.)

Holder and Munday recorded/transcribed their interview of Blackmon on October 26, 1983, which began at around 9:36 a.m. (J.A.52). During the first hour of this interview, Holder and Munday asked Blackmon "where have you been in that dorm," to which Blackmon responded "I'll say about on the top floor, actually through the whole complete building." (J.A.52.) The top floor of the building is the sixth floor, where Ms. Payton's attack occurred. (J.A.52.) When Holder suggested that he, Munday and Blackmon actually go to the top floor of the dorm, Blackmon eagerly agreed, stating "I will know everything." (J.A.54.) When Holder expressly asked, "[y]ou want to do that," Blackmon stated, "yes, now." (J.A.54.)

4

From 10:43 a.m. to 12:32 p.m. on October 26, 1983, Holder, Munday and Blackmon visited the St. Augustine's campus for a second time. (J.A.54.) Like before, conversations during that visit were not tape recorded, however, "Investigative Notes" concerning the visit were prepared. (J.A.54.) The "Investigative Notes" prepared by either or both Holder and Munday include the following information concerning the October 26, 1983 visit:

- While the group was on the top floor of Latham Hall, Blackmon identified the bathroom stall where Ms. Payton was attacked.

- Blackmon also then stated that he had washed his hands in the sink afterwards.

- "Blackmon requested earlier that he wanted to show these investigators where he went in Latham Hall and also show them what he did and where it happened."

(J.A.54-55.)

Blackmon was eventually arrested on December 7, 1983 and charged with the murder of Helena Payton. (J.A.71.) On December 8, 1986, Blackmon's criminal defense attorney filed a motion to suppress the statements obtained by Holder and Munday, which motion was denied on August 31, 1987. (J.A.65.) Blackmon remained in custody awaiting trial until, on the advice of his legal counsel, he entered a guilty plea to second-degree murder on January 14, 1988. (J.A.65-66.) In advising him to plead guilty, Blackmon's criminal defense attorney "advised [him] that he

5

would preserve for appeal the admissibility of the statements obtained by Holder and Munday." (J.A.65.)

Blackmon thereafter appealed to the North Carolina Court of Appeals, based on "the trial judge's denial of [Blackmon's] motion *in limine* to suppress the statements [he] made to detectives Holder and Munday." *State v. Blackman*, 93 N.C. App. 207, 213, 377 S.E.2d 290, 294 (1989).[1]  In a published opinion, the North Carolina Court of Appeals affirmed the trial court's decision, rejecting Blackmon's contentions that "he was not mentally competent when he made his admissions" and "that he made the statements during custodial interrogations without the benefit of *Miranda* warnings."  93 N.C. App. at 209-10, 377 S.E.2d. at 292.  Importantly, the Court of Appeals specifically held that Holder and Munday did not act coercively in their tactics while interviewing Blackmon.  *Id.* at 211, 377 S.E.2d. at 293.

In March 2012, the North Carolina Innocence Inquiry Commission ("NCIIC") began investigating Blackmon's case.  (J.A.13.)  Over a six-and-a-half-year period, NCIIC staff members conducted an investigation which ultimately resulted in a three-day hearing before the North Carolina Innocence Commission from November 14-16, 2018.  (J.A.14.)  Approximately nine months later, a three-judge panel

---

[1] The underlying criminal matter used the name "Blackman" to refer to Appellant's decedent, whereas in this case, his name has been spelled "Blackmon."  There is no dispute, of course, that this is the same individual and that this published case of the North Carolina Court of Appeals refers to the same underlying factual circumstances.

concluded that Blackmon had proven that he was innocent of Helena Payton's murder. (J.A.14.)

## SUMMARY OF THE ARGUMENT

In 1983, there was no controlling legal precedent to inform a North Carolina law enforcement officer that asking leading, suggestive, or even manipulative questions to a psychologically or mentally infirm suspect was violative of such suspect's federal constitutional right to be free from a coercive interrogation/interview. This lack of precedent was confirmed six years later, in 1989, when the North Carolina Court of Appeals specifically held that Detectives Holder and Munday had not coerced Blackmon's confession. Appellant knows this and, accordingly, he has, for the second time before this Court, carefully avoided casting his § 1983 claims in this action as those deriving from a coerced confession.[2] Instead, in an attempt to avoid the application of qualified immunity, Appellant has again costumed his claims, contorting them into those purporting to sound in "intentional fabrication of evidence." However, the legal authority on which Appellant relies in an attempt to save his § 1983 claims does not address the type of fabrication claim that he spelled out in the facts alleged in his Complaint—that is, a fabricated false confession claim. Only one decision within the jurisdiction of this

---

[2] This is Appellant's second appeal to this Court seeking reversal of the July 8, 2021 lower court order dismissing his federal individual-capacity claims against Holder and Munday.

Circuit has addressed such a unique claim, and Appellant has again failed to cite to it in his brief to this Court: *Washington v. Buraker*, 322 F.Supp.2d 692 (W.D. Va. 2004) (hereinafter "*Washington I*").

Appellant does not wish to bring *Washington I* to the attention of this Court because it dooms his intentional federal constitutional claims. This is because *Washington I* correctly requires allegations and evidence that Holder and Munday had actual knowledge of Blackmon's innocence at the time of their interviews of him in order to sustain § 1983 claims based on a deliberately fabricated false confession that Blackmon himself made. Appellant, though, pled himself out of such a claim, admitting that Holder and Munday believed that Blackmon was guilty of the murder of Helena Payton. The irreconcilable nature of, on the one hand, Appellant's factual admission in his pleading and, on the other hand, the dictates of the unique legal claim he sought to bring, led the District Court to the only possible conclusion it could reach: the dismissal of Appellant's deliberate conduct individual-capacity federal constitutional claims on the basis of qualified immunity.

While, for the first time here, Appellant attempts to course correct and assert the type of fabricated evidence claim supported by his cited legal authority— that is, a claim that the police fabricated evidence by attributing statements to Blackmon that he did not actually make— such claim fails right out of the gate. First, the conclusory assertion that Holder and Munday attributed false statements to

Blackmon, encapsulated in one paragraph of the Complaint, is belied by the rest of the Complaint. Second, the alleged statements falsely attributed to Blackmon were neither the but for nor proximate cause of his conviction and incarceration.

Finally, that Holder and Munday did not abandon their investigation of Blackmon simply because of the existence of exculpatory evidence (in addition to inculpatory evidence) also does not create a constitutional claim. None of the exculpatory evidence *eliminated* Blackmon as a suspect, and therefore, Holder and Munday were left to weigh competing evidence in determining Blackmon's viability as a suspect—all without the benefit of 20/20 hindsight. As the District Court correctly concluded, at most, the Complaint alleged a negligent state of mind as to Holder and Munday in their crediting of inculpatory over exculpatory evidence and in their resultant pursuit of Blackmon's confession. Thus, the Complaint failed to allege a constitutional violation based on reckless conduct.

Accordingly, as further detailed *infra*, the District Court's dismissal of the federal individual-capacity claims should be affirmed.

## ARGUMENT

I.   **THE DISTRICT COURT CORRECTLY CONCLUDED THAT HOLDER AND MUNDAY WERE ENTITLED TO QUALIFIED IMMUNITY FROM APPELLANT'S INDIVIDUAL-CAPACITY § 1983 CLAIMS, INCLUDING THOSE BASED ON ALLEGED DELIBERATE CONDUCT.**

Holder and Munday asserted qualified immunity as a bar to the § 1983 claims brought against them in their individual capacities, and it is on that basis that the District Court granted their respective Motions to Dismiss nearly three years ago. As discussed further below, the District Court properly applied qualified immunity to the § 1983 claims alleged therein against Holder and Munday.

> Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery… The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.

*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original).

To overcome qualified immunity from § 1983 claims, a plaintiff must plead and prove that a governmental official, acting under color of law, "violate[d] [the plaintiff's] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "For a right to be 'clearly established,' in a qualified immunity case, 'the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013),

*quoting*, *Wilson v. Layne*, 526 U.S. 603, 605 (1999). Only jurisprudence in existence at the time of the alleged conduct can clearly establish a constitutional right, and then only case law from the U.S. Supreme Court, this Court, or the North Carolina Supreme Court. *See id.* at 322. ("We have long held that it is case law from this Circuit and the Supreme Court that provide notice of whether a right is clearly established.")

Here, the District Court correctly concluded that either (i) knowledge of innocence is required where the allegations concern an intentional fabrication of a confession actually made; and (ii) any allegations of negligence do not give rise to a constitutional violation. Thus, both prongs of qualified immunity support the District Court's dismissal of the § 1983 claims in this case. Holder and Munday did not violate Blackmon's constitutional rights, and certainly not any constitutional right that was clearly established by the U.S. Supreme Court, this Court, or the North Carolina Supreme Court as of October 1983. Accordingly, the Complaint failed to state the § 1983 claims alleged therein against Holder and Munday.

## A. Appellant cannot prevail on a coerced confession claim, and he knows it.

The North Carolina Court of Appeals directly addressed whether, as a matter of law, Holder and Munday's "use of [Blackmon's] psychiatric history to guide their interrogative tactics constituted coercion" in obtaining his confession. *Blackman*,

93 N.C. App. at 211, 377 S.E.2d at 293.  The Court of Appeals answered this inquiry, while summarizing the details of the interviews with Blackmon:

> We reject this contention.  Holder and Munday clearly ingratiated themselves with defendant and presented themselves as his friends.  We are not prepared to hold, however, that simply because the police adopt a strategy for the dealings with a suspect that that strategy is therefore coercive.  At no time did these detectives force defendant to submit to any of the ordeals traditionally associated with coercive interrogations… We hold, therefore, that the interviews in which defendant participated with Holder and Munday were not coercive…

*Id.* at 211-12, 377 S.E.2d at 293.

Since an appellate court of law in 1989 did not determine Holder and Munday's conduct to be unconstitutionally coercive, it would, naturally, be incongruent to expect a reasonable law enforcement officer six years earlier to have understood that ***same conduct*** to be unconstitutional.  For purposes of qualified immunity, had the Court of Appeals been bound by authority in either the United States Supreme Court or the North Carolina Supreme Court, then it would have reached the contrary conclusion.  At a minimum, Blackmon would have sought discretionary review to the North Carolina Supreme Court and certiorari to the United States Supreme Court, if necessary.  As it turns out, he did not.

In fact, when the North Carolina Court of Appeals concluded that Holder and Munday had not acted in a coercive manner, it did so with the benefit of, and relying on, *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515 (1986).  In *Connelly*, the Court concluded that a confession was voluntary where a suspect suffering from

12

schizophrenia confessed to a murder. *See id.* at 160-62, 107 S.Ct. at 518-519. After being found competent to stand trial, the suspect moved to suppress his confession. *See id*. At the evidentiary hearing on that motion, a psychiatrist for the State testified that his interviews with Connelly "revealed that respondent was following the 'voice of God.'" *Id*. at 161, 107 S.Ct. at 518. The State's psychiatrist also "testified that Connelly's illness did not significantly impair his cognitive abilities" and that "the 'voices' could in reality be Connelly's interpretation of his own guilt," but that "Connelly's psychosis motivated his confession." *Id.* at 161-62, 107 S.Ct. at 519. In dissent, Justice Brennan, citing to the record on appeal, noted that ***officers knew of Connelly's mental illness when they obtained the confession from him***. *Id*. at 180, 107 S.Ct. at 528 n.3 (Brennan, J., dissenting) (emphasis added).

After the lower state court excluded the confession on the grounds that it was involuntarily given and the Colorado Supreme Court affirmed, the United States Supreme Court reversed, holding "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Id.* at 167, 107 S.Ct. at 522. "Respondent's perception of coercion flowing from the 'voice of God,' [*i.e.*, internal mental influences on the suspect] however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak." *Id.* at 170-71, 107 S.Ct. at 523-524.

Appellant knows that there are rigid legal obstacles to successfully asserting that Blackmon's confession was unconstitutionally coerced by the conduct of Holder and Munday in 1983. This is likely why he retreats from allegations of coercion and strains, unsuccessfully, to allege an intentional fabrication of evidence theory to shore up his § 1983 claims.

**B.    Appellant's cited legal authority falls short of supporting his claim that the detectives deliberately caused Blackmon to make false admissions.**

In his Complaint, Appellant mislabels the inculpatory statements made by Blackmon as "fabricated evidence." Neither this Court, nor the District Court before it, is obliged to accept as true the "labels and conclusions" fashioned in the Complaint by the Appellant.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions…").  The conduct that the Appellant mislabels as the detectives' fabrication of evidence through alleged "manipulative techniques" is, paradoxically, ***Blackmon's own words***. (JA74-75.)

None of the in-circuit cases cited in Appellant's Brief refer to inculpatory statements actually made by a plaintiff as examples of "fabricated evidence" or "false evidence" created by the intervening law enforcements officers, and no cases cited in Appellant's Brief-- even those he presents to this Court for the first time-- refer to any of Blackmon's clearly established constitutional rights as of October 1983 that Holder and Munday are alleged to have violated.

14

Appellant again turns to the Second Circuit which addressed a confession fabricated, or manufactured, by the police where the plaintiff denied having made the statements attributed to him—***i.e., not*** statements actually made by the declarant as a result of "manipulative [interview] techniques," as is alleged here. *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997).[3] Thus, while it is true that *Ricciuti* is a § 1983 case concerning a fabricated confession, the crucial distinction between the Blackmon confession and the confession in *Ricciuti* is that the plaintiff in *Ricciuti* denied ever making the statement at all, claiming that the police lieutenant typed an unsigned and fictitious confession. *See Ricciuti*, 124 F.3d at 126. While Appellant disclaims coercion, his Complaint discloses that Blackmon actually made the inculpatory statements.

Another case carried over from Appellant's first appeal to this Court—in this instance from this Circuit—is the same type of alleged fabrication contemplated by

---

[3] Though *Ricciuti* is entirely inapposite to the case at bar, Appellees note that the fabricated confession in *Ricciuti* took place in 1989 and the Second Circuit's opinion is from 1997—both years after the confession in this case from 1983. Thus, even if the facts in *Ricciuti* bore a sufficient nexus to the factual allegations *sub judice*, the opinion in *Ricciuti* could not have put Holder and Munday on notice that their conduct violated the Appellant's clearly established rights in 1983. *See Hill*, 727 F.3d 312, 321 (4th Cir. 2013). ("In deciding whether a defendant is entitled to qualified immunity, we examine… whether [a defendant's] conduct was objectively reasonable in view of the clearly established law at the time of the alleged event.") Moreover, this Court does not rely on out-of-circuit precedent in determining whether a sufficiently contoured constitutional right was clearly established at the time of the alleged violative conduct. *See id.* at 322.

the Second Circuit in *Ricciuti*, *i.e.*, investigators attributing a confession to the suspect that the suspect disavows ever making. *See*, *e.g.*, *Gilliam v. Sealey*, 932 F.3d 216, 226-28 (4th Cir. 2019). *Gilliam* involved murder confessions that officers represented were made by two brothers. *See id*. The first of two would-be declarants, McCollum, said of his alleged signed confession that "the officers told him that if he signed a form—the *Miranda* waiver form—they would let him go home." *Id*. at 226-227. "McCollum signed the form without reading it… and [during the interview with officers] McCollum repeatedly denied being involved." *Id* at 227. "McCollum signed the paper—which was actually the confession written out by Snead—but he did not read it and it was not read to him. **McCollum denies that he confessed to raping and murdering Buie.**" *Id.* (emphasis added).

The second of the two would-be declarants, "Brown[,] denied any knowledge of the crime and stated that he was innocent" during his interrogation with officers. *Id.* "**Brown testified… that he did not say the things that are written in the confession**…" and only signed it "after an officer told him doing so would ensure his release." *Id.* at 227-28 (emphasis added).[4] When he read the confession

---

[4] The interrogative tactics presented in *Gilliam* are almost polar opposite of how Holder and Munday are alleged to have treated Blackmon. As summarized in the factual statement of this Brief, *supra*, the Complaint discloses that Blackmon was free to come and go over the course of several days, was taken for food and drink, provided cigarettes and bathroom breaks, driven around, and was free to move about the scene of the crime on his own.

thereafter, "***Brown told the officers that it was not true***." *Id.* at 228 (emphasis added).

Thus, both plaintiffs in *Gilliam* contended that they (1) denied their guilt in their respective interviews with officers, (2) were provided forms to sign on promise of release, and (3) signed what turned out to be confessions. Different from Blackmon, both *Gilliam* plaintiffs denied that they made the inculpatory statements attributed to them.[5]

Appellant also again relies on *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014), a case in which the would-be declarant "maintained his innocence throughout the interrogation" but an interrogating officer "recorded the alleged confession in a question-and-narrative-answer format," and "slid[] each finished page of what appeared to be a summary of [the declarant's] oral confession underneath the door" to a waiting prosecutor. *Id.* at 283-84. The alleged declarant signed an "incriminating statement" but "claimed in his deposition to have signed the statement to 'get away' from the detectives…" *Id.* at 284. In *Halsey*, the Third

---

[5] Moreover, as to the qualified immunity analysis in *Gilliam*, while the Court concluded that it was clearly established in 1983 that individuals have a "right not to be arrested without probable cause based on a coerced and fabricated confession," again, Appellant has disclaimed a coercion claim here and the fabrication in *Gilliam*, as discussed *supra*, is an actual manufacturing of a confession replete with a dispute over whether the inculpatory statements were ever made by the plaintiffs. That dispute does not exist here and, thus, *Gilliam* is inapposite.

Circuit held that a genuine dispute of material fact existed as to the fabricated confession. *See id*. at 294-295. However, and like the cases discussed *supra*, crediting the plaintiff's version of the interrogation, the inculpatory statement itself was actually manufactured by the officers—*i.e.*, the plaintiff in *Halsey* contended he never made the inculpatory statements attributed to him by the officers in the alleged confession.[6]  Moreover, the Third Circuit went out of its way in *Halsey* to limit its holding, observing "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to be wrong." *Id.* at 295.

Appellant's continued reliance on *Gonzalez v. City of Waukegan*, 220 F.Supp.3d 876 (N.D. Ill. 2016) and *Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017), (Appellant Br. 38, ECF No. 23), is equally misplaced. *Gonzalez*, similar to *Ricciuti*, *Gilliam*, and *Halsey*, involved a confession authored by law enforcement, which was signed by a plaintiff-suspect who later disavowed ever making the confession. *Gonzalez*, 220 F.Supp.3d at 882. The subject fabrication in *Spencer* was the defendant-officer's mischaracterization of witness statements in her investigative reports. *Spencer*, 857 F.3d at 793.

---

[6] Appellant's reliance on *Halsey* suffers from the same limitations as his reliance on *Ricciuti* with respect to the 'clearly established' prong of qualified immunity.  In addition to being inapposite from a factual perspective as described herein, the alleged officer misconduct took place in 1985 and this out-of-circuit opinion was issued in 2014—all after the alleged officer misconduct took place *sub judice*, in 1983.

In this, his second attempt at challenging the District Court's dismissal order, Appellant cites to a few additional cases-- including an out-of-circuit case-- which, in his view, support his fabrication theory as a "well-established principle." Query then why these new cases were not cited in the first brief to this Court on this very issue? (USCA4 22-1824 ECF No. 19.) These cases were not originally cited by Appellant because, notwithstanding the Appellant Brief's characterization of those holdings as dispositive, they again are entirely inapposite as to whether the use of a confession in-fact made by a criminal defendant is "fabricated evidence" for due process purposes such as to circumvent a coercion analysis.

Appellant cites to *Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012), which relies, in relevant part, on another Eighth Circuit opinion, *Wilson v. Lawrence Cty.*, 260 F.3d 946 (8th Cir. 2001). *See Winslow*, 696 F.3d at 734; 738-39. Weighing heavily on the *Wilson* and *Winslow* analysis of whether investigative conduct crosses the line from alleged negligence to the deliberate indifference required for a due process violation is whether the officers had the opportunity to deliberate, having in their investigation "the luxury of unhurried judgments and repeated reflections…" *Winslow*, 696 F.3d at 734, *quoting Wilson*, 260 F.3d at 957. In other words, the entire analysis of the officers' conduct in *Winslow* is colored by the Eighth Circuit's adoption of the "opportunity to deliberate" standard for deliberate indifference.

This line of cases, however, is not the law of the Fourth Circuit. In fact, *Wilson* has been expressly disclaimed by a district court of this Circuit as not having any force herein:

> The Fourth Circuit… has rejected the "opportunity to deliberate" line of cases [*i.e.*, including *Wilson*], holding that "the case law as a whole is against a general rule that time to deliberate transforms negligent error into constitutionally shocking conduct.

*Slaughter v. Mayor and City Council of Baltimore*, 757 F.Supp.2d 548, 551 (D. Md. 2010) (citing specifically to the Eighth Circuit's opinion in *Wilson* as an example of an "opportunity to deliberate" case), *quoting Waybright v. Frederick Cnty., MD, Dep't of Fire and Rescue Servs.*, 528 F.3d 199, 206 (4th Cir. 2008).

As this Court noted in *Waybright*, the Sixth Circuit-- another "opportunity to deliberate" circuit-- views "the determining factor" for "deciding whether deliberate indifference shocks the conscience [is] 'whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct'." *Waybright*, 528 F.3d at 206, *quoting Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 601 (6th Cir. 2005). Where, then, there is deliberative investigative conduct in question, as it was in *Winslow*, these out-of-circuit cases do not delineate between negligent and deliberately indifferent conduct and thus are inapposite. In keeping with the law of **this** Court, the lower court in the present action specifically noted in the putatively appealed-from order *sub judice* the distinction between a negligence standard and a deliberate indifference standard of culpability. (J.A.117-

118.)  Since the law of this Circuit does not follow the "opportunity to deliberate" doctrine upon which *Wilson* is premised, it thus follows that its progeny relied upon by Appellant, *Winslow*, enjoys no persuasive authority before this Court.

Indeed, Appellant does not cite to *any* case law from either the U.S. Supreme Court, Fourth Circuit, or North Carolina Supreme Court which clearly establishes a constitutional right of Blackmon's that Holder and Munday violated when they interviewed him in 1983 and he, himself, made admissions. *See Hill*, 727 F.3d at 321.

Instead, again for the first time, Appellant cites to an admonition from this Court in 1967 against the improper withholding of an exculpatory report by a prosecutor to attempt to stand in as clearly establishing a right to be free from the use of false evidence in this case. *See Hamric v. Bailey*, 386 F.2d 390 (4th Cir. 1967). In its proper context, having been handed down in the years immediately following the Supreme Court's decision in *Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the appeal in *Hamric* emanated from a criminal trial turning on self-defense from a home intrusion, wherein the prosecutor adduced testimony that there was no wood or glass on a victim's clothes at the time of death where the prosecutor knew, but had not disclosed, the existence of a lab report that noted particles of wood and glass on the victim's clothes. 386 F.2d at 394-95. In an unusual turn of events, it appears the report was disclosed during jury deliberations

after a juror had, apparently *ex parte*, inquired to a state trooper in the courtroom and learned that there was evidence of wood and glass on the victim's clothes. *Id*. at 393. The criminal defendant sought a writ of *habeas corpus* following conviction and the district court granted relief. *Id.* at 391. The state appealed and this Court agreed that the use of misleading testimony adduced in trial without disclosure of the lab report violated the Fourteenth Amendment. *Id.* at 395. *Hamric* did not, however, clearly establish in 1967 that a suspect actually uttering a confession to a crime that turned out to be false was therefore "fabricated" by investigating law enforcement officers because there was competing evidence of guilt and innocence.[7]

Likewise, Appellant's reliance on *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) is unavailing and misplaced. In *Miller*, the prosecution knew that reddish-brown stains on shorts thought to be worn by the suspect at the time of the murder were "not blood, but paint," but nonetheless offered a chemist at trial to testify that the stains on the shorts were dried blood and that the blood type on the shorts matched that of the minor victim. 386 U.S. at 4-6. Again, this case does not involve a confession at all, much less a holding which concludes that a fabrication has occurred where the declarant admits to making the inculpatory statement but

---

[7] Again, had *Hamric* clearly established the right at hand, the Court could presume that-- at some point over the course of the last nearly four years-- Canady would have directed either this Court or the District Court to this nearly 60-year old case before now.

22

instead alleges he was improperly influenced-- but not, as Appellant's argument requires, coerced.

Thus, while Appellant has pointed to case law that, at a general level, discusses the uncontroversial concept that the fabrication of evidence by law enforcement or prosecuting authorities has long been recognized as a constitutional deprivation, Appellant has not pled facts consistent with a fabrication claim, nor has Appellant directed the Court to any binding authority which recognizes the "fabrication" or false evidence claim he purports to plead.[8]

By contrast, Appellant alleges the following in the Complaint:

149.   By 1983 it was well known to law enforcement that **mentally ill** people and people with intellectual disabilities… were highly suggestible and prone to making unreliable and false statements under police questioning.

(…)

---

[8] The *only* case discussed in Appellant's Brief that possibly recognizes the existence of such a claim at all is an out-of-circuit opinion where (i) the factual allegations are readily distinguishable in several respects but, most notably, in that the involved-officers appeared to have exclusively supplied the inculpating information to the plaintiff, subjecting him to nearly thirty-hours of interrogation, whereas *sub judice*, even Appellant admits by way of allegation that Blackmon offered *some* independent information (*see e.g.* JA 51 at ¶ 179) and was, as discussed *supra*, allowed to come and go freely, offered food and drink, etc.; (ii) the allegedly fabricated confession occurred in 2009, not 1983; (iii) the court did not rely on any underlying case law which would have put Holder and Munday on notice in 1983 that *their* conduct in interviewing Blackmon violated his rights; and (iv) the decision was premised on, again, either actual knowledge of innocence or a reckless disregard for the truth-- not, as the District Court here found, "a negligent mental state" (JA117.) *See Sanchez v. Hartley*, 810 F.3d 750, 756-57 (2016).

151.   Despite this, Holder and Munday deliberately and intentionally used Blackmon's mental illness and delusions to fabricate a false confession to the murder of Helena Payton.

152.   In interrogating Blackmon, Holder and Munday used the following ***techniques***, all of which they knew, or reasonably should have known, were likely ***to lead <u>him</u> to fabricate a false confession***…

(JA43) (emphases added).

Significantly, Appellant alleges in the Complaint that Blackmon—*i.e.*, "him" in Paragraph 152, and *not* Holder or Munday—"fabricate[d] a false confession" because "Holder and Munday used… techniques," and because he was "highly suggestible" as a result of his "mental ill[ness]." Put another way, Appellant alleges that Holder and Munday caused Blackmon to "fabricate" evidence against himself. This, then, is merely a doomed coerced confession claim masquerading as a fabrication claim.

## C.   There is only one decision within the geographic boundaries of this Circuit that has addressed the type of fabrication claim that Appellant attempts to assert, and Appellant has ignored it.

Appellant contends that the District Court "went amiss" because "[its] opinion focused on whether Munday and Holder knew [Blackmon] was innocent when they fabricated the false evidence."  (Appellant Br. 36, ECF No. 23.)  This is actually where Appellant's argument goes "amiss," as the District Court's focus is supported by *Washington I*. Even so, Appellant selectively quoted from other decisions in the *Washington* line, discussed below, to create the appearance of jurisprudential

support for his claims where none actually exists. When unpacked, the *Washington* line of cases supports the District Court's dismissal of the fabrication claims made in this case.

### 1. *Washington I*

*Washington I*, the first in the line of reported decisions deriving from the same action, involved two sources of alleged fabrication at the district court level: (1) an alleged "fabricated false confession" resembling Appellant's purported claim in this case; and (2) the alleged fabrication of a police report (and trial testimony) of one of the defendant-officers. *See Washington I*, 322 F.Supp.2d at 695. This is the only reported case within the confines of the Fourth Circuit that comes anywhere close to recognizing the unique claim that Appellant pursues in this action—that is, one in which law enforcement officers are alleged to have caused the plaintiff to fabricate his own false confession. Importantly, the *Washington I* court considered the question of whether the defendant-officers' had actual knowledge of the innocence of the plaintiff-suspect as the lynchpin issue in the "fabricated false confession" claim. *Id*. at 697-698.

In a critical distinction from the present case, the plaintiff in *Washington I* did not allege that the investigating officers "believed [the suspect] had committed the murder." Accordingly, recognizing that the defendant-officers' actual knowledge, or lack thereof, of the plaintiff's innocence was the determining inquiry on the

intentional "fabricated false confession" claim, the district court ordered limited

discovery as to "whether [the investigating] officers… had **actual** knowledge of

Washington's innocence at the time of Washington's interrogation" before ruling on

the officers' dispositive motions. *Id.* at 698 (emphasis added). This is likely why,

while referring this Court to other decisions within the *Washington* line of cases

(which are discussed below), Appellant did not cite to *Washington I* in his brief.

### 2.    *Washington II*

By the time of *Washington v. Buraker*, 322 F.Supp.2d 702 (W.D. Va. 2004)

("*Washington II*"), the plaintiff had conducted limited discovery related to the

officers' alleged knowledge of his actual innocence, and was unsuccessful in

forecasting any evidence to that effect. 322 F.Supp.2d 702, 708. ("There is no

evidence on the record tending to show that [the investigating officers] knew that

Washington was actually innocent of the Williams murder when he was interrogated

following his arrest…")  As a result, Washington's fabrication claim shifted to the

issue that ultimately made its way to this Court. *See id*. His fabrication claim no

longer concerned an allegation that the defendant-officers actually knew

Washington was innocent but "fabricated" a confession anyway; rather, the

fabrication claim that survived *Washington II*, and was eventually reviewed by this

Court, was based on entirely separate conduct:

> Washington's fabrication claim is based on evidence that his confession
> included nonpublic facts.  Washington does not contend that the use of

leading questions violates a suspect's rights. The concern, rather, is that [Officers] Wilmore and Hart later claimed that nonpublic information originated from Washington. ***Specifically, Washington accuses Wilmore and Hart of "falsely documenting, misreporting to the prosecutor (and testifying) that the nonpublic information originated with Washington.***"

*Id.* at 709 (emphasis added).

The *Washington II* trial court examined the evidence against the two defendant-officers, Wilmore and Hart, and concluded that the fabrication claim against Wilmore could survive, but that the fabrication claim against Hart could not. A police report authored by Wilmore that was at the center of the claim against him stated, "that Washington 'gave pertinent information about the crime that no one knew with the exception of himself.'" *Id.* at 710. Moreover, referring to a prosecutor's memorandum concerning a telephone conversation between the prosecutor and Wilmore ten years after the subject trial testimony, the court concluded that it "does not establish . . . evidence concerning the circumstances of Washington's confession, but it does show that Wilmore was concerned that the record did not accurately reflect Washington's confession." *Id.* at 711. Ultimately, given the foregoing evidence against him, Wilmore's summary judgment motion based on qualified immunity was denied.

However, the court found that summary judgment was appropriate as to Officer Hart, who was not implicated in the evidence used to justify denial of qualified immunity to Wilmore:

27

> ***Even assuming that Hart asked Washington leading questions***, the record supports the conclusion that Washington answered those questions, and confessed to the Williams murder. ***The confession itself was not a fabrication***.

*Id.* at 712 (emphasis added).

*Washington II*'s discussion of the summary judgment motions of Wilmore and Hart is instructive because it highlights the two very distinct types of fabrication claims that Appellant conflates in his principal brief. While the fabrication claim against Wilmore became the focus of the Fourth Circuit's review, the claim against Hart that he fabricated Washington's confession by asking leading questions never survived *Washington II*. Here too, even assuming Holder and Munday asked Blackmon leading questions, the factual allegations of the Complaint support the conclusion that the confession itself was not an intentional fabrication, particularly because the Appellant unequivocally alleges that Holder and Munday believed Blackmon committed the murder.

### 3. The *Washington* Appeal

Wilmore appealed the denial of qualified immunity by the district court and this Court affirmed. *Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005) (hereinafter "*Washington* Appeal"). This Court's opinion, then, did not address the fabrication of a "false confession"; rather, closer to the facts in *Spencer*, it addressed fabricated statements in a police report ***mischaracterizing*** the plaintiff's confession. *See id.* As such, the *only* evidence of a fabrication claim that survived for this

Circuit's review was related to fabrication of a police report and subsequent trial testimony thereupon.

Admittedly, actual knowledge of a suspect's innocence may not **always** be required in order for fabricated evidence, in general, to be actionable under § 1983. However, it **must** be required under Appellant's alleged facts. As *Washington I* instructs, the question of whether Holder and Munday knew of Blackmon's innocence when they interviewed him goes to the central issue of whether they were deliberately eliciting a false confession from him. For **only** if Holder and Munday knew Blackmon was innocent could they have known that Blackmon was fabricating his own confession based on their leading questions. The actual knowledge requirement in *Washington I*—invoked when the alleged intentional fabrication is a confession uttered by the suspect himself—is a necessary shield, preventing a "fabricated false confession" claim from devolving into the exact claim that has no support under the law: one that seeks to foist liability on to investigators for asking leading, suggestive and even manipulative questions, in 1983, of an infirm confessor.

### D. Appellant's factual allegations irreconcilably contradict the legal standard required for his theory of recovery under § 1983.

Appellant contends that "all [he] was required to do" in his Complaint "was plead factual allegations that raise a right to relief above a speculative level," such that the Complaint "state[s] a claim to relief that is plausible on its face." (Appellant

29

Br. 30, ECF No. 23) (internal quotations and citations omitted). The District Court, however, rooted its dismissal of the deliberate conduct § 1983 claims on the fact that Holder and Munday's alleged belief that Blackmon was guilty "directly contradicts" his theory of liability. (J.A.117.)

"[W]hen a complaint contains inconsistent and self-contradictory statements, it fails to state a claim." *Arkansas Nursing Home Acquisition, LLC v. CFG Community Bank*, 460 F. Supp. 3d 621, 637 (D. Md. 2020); *see also, In re Livent, Inc. Noteholders Securities Litigation*, 151 F. Supp. 2d 371, 405-406 (S.D.N.Y. 2001) (collecting cases) (*e.g.*, "…a court need not feel constrained to accept as truth conflicting pleadings… that would render a claim incoherent, or that are contradicted… by statements in the complaint itself…".); *cf., Goines v. Valley Community Srvcs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (the same principle applies where there exists a "conflict between the bare allegations to the complaint and any exhibit attached …, the exhibit prevails.").

Appellant's own allegation that Holder and Munday ***believed that Blackmon was guilty*** of the murder of Helena Payton pled him right out of the very claim he was attempting to make—a *Washington I*-style intentional fabricated false confession claim. Accordingly, the District Court appropriately concluded that, to satisfy the deliberateness standard in *this* due process claim, actual knowledge of innocence was required just as it was in *Washington I*. Since Appellant pled the

polar opposite of this standard, his federal constitutional claims were properly dismissed.

> **E.    Appellant's attempt at a new fabrication claim alleging that Holder and Munday attributed statements to Blackmon that he did not actually make utterly fails.**

In a strained effort to resuscitate the three federal individual-capacity claims dismissed by the District Court in this action, Appellant attempts in this Court what it never attempted at the trial court level— i.e., to contort at least a portion of the Complaint's allegations into "the *Washington* paradigm for a claim of police fabrication of statements ***never made by a suspect***." (Appellant's Br. 39, ECF No. 23) (emphasis added). Accordingly, Appellant now contends that Holder and Munday fabricated, in their "Investigative Notes" concerning the second visit to St. Augustine's, two incriminating statements which Blackmon did not make. Specifically, according to Appellant, Holder and Munday falsely claimed in the "Investigative Notes" that Blackmon stated he (1) "*wanted to show these investigators where he went in Latham Hall and*" (2) "*also show them what he did and where it happened*." (Appellant's Br. 19-20, 38-39, ECF No. 23.) (emphasis in original). Indeed, even though, to use Appellant's own words, "the gravamen of the Complaint was that the officers *had caused Blackmon to make* (or "fabricate") false admissions by the use of psychologically manipulative interrogation techniques," (Appellant's Br. 26, ECF No. 23) (emphasis in original), the Complaint does assert

31

in one single paragraph out of 345 that the two subject statements "are inconsistent with the tape-recorded statements of Blackmon." (J.A. 54.)[9] Importantly, these are the only two statements in the "Investigative Notes" that the detectives are alleged to have fabricated. This allegation, however, does not withstand the requisite plausibility analysis when confronted with the remaining allegations of the Complaint.

### 1. The challenged statements were, by Appellant's own allegations, not fabricated.

Notwithstanding the assertion in Paragraph 191 of the Complaint, multiple other paragraphs of the 345 make clear that the two statements in question were not fabricated. Appellant's own allegations concerning statements Blackmon made **before** the October 26, 1983 Latham Hall visit directly contradict the assertion that the first statement of the "Investigative Notes"— that Blackmon "wanted to show these investigators where he went in Latham Hall"— was manufactured by Holder and Munday:

- During the first, October 25, 1983 visit to St. Augustine's, Blackmon told Holder and Munday "that's the girl's dorm … I have been there before." (J.A. 51, ¶ 179.)

- During the first hour of his October 26, 1983 tape-recorded interview, before the second visit to St. Augustine's, Holder and Munday asked Blackmon "where have you been in that dorm," to which Blackmon

---

[9] The Complaint makes this assertion while simultaneously admitting that the recorded/transcribed portions of the officers' interviews of Blackmon did not capture all of the conversations between the three men. (J.A. 33.)

replied "I'll say about on the top floor, actually through the whole complete building." (J.A. 52, ¶ 185.)

- Also during that first hour of the October 26, 1983 tape-recorded interview, Holder (1) suggests that he, Munday and Blackmon actually go to the top floor of Latham Hall and Blackmon agrees, saying "I will know everything"; and (2) asks Blackmon "[y]ou want to do that," to which Blackmon responds "yes, now." (J.A. 54, ¶ 189.)

Accordingly, the above statements from Blackmon which Appellant has **_not_** challenged as not actually made by him, support at least the first statement in the "Investigative Notes" that Blackmon stated "he wanted to show these investigators where he went in Latham Hall."

Appellant's own allegations concerning other statements attributed to Blackmon in the "Investigative Notes," which have not been challenged as not having actually been made by him, also support the second portion of the "Notes" that Appellant now challenges as fabricated:

- When Holder told Blackmon "to look into the bathroom to see if it looked familiar," Blackmon identified the very stall in which Ms. Payton had been attacked. (J.A. 54, ¶ 192).
- Blackmon also then stated that "he had washed his hands in the sink afterwards." (J.A. 54-55, ¶ 192).

These un-challenged statements attributed to Blackmon vindicate the second challenged statement that Blackmon stated he "also wanted to show [the detectives] what he did and where it happened."

Appellant's effort to save his fabrication claims by, at this late hour, claiming that the "Investigative Notes" attribute statements to Blackmon that he did not

actually make is entirely contradicted by his own allegations in the Complaint. Appellant has failed, then, to plausibly allege "the *Washington* paradigm for a claim of police fabrication of statements never made by a suspect," and therefore, all of his claims based on this assertion fail as a matter of law.

> **2.    Alternatively, the challenged statements were not the but for or proximate cause of Blackmon's guilty plea and incarceration.**

Even if this Court is persuaded that Appellant has plausibly alleged that Holder and Munday fabricated statements never made by Blackmon, any federal individual-capacity claims deriving from this allegation still fail because the statements in question did not result in the deprivation of Blackmon's liberty. Blackmon must allege and show that the alleged fabrications "actually caused his conviction, as well as demonstrate that his conviction was a reasonably foreseeable result of [the officers'] initial act of fabrication." *Howard v. City of Durham*, 487 F.Supp.3d 377, 405 (M.D.N.C. 2020) (citing *Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005)). Appellant's own allegations strip away the causation element of this doomed fabrication claim.

Instead of asserting that the challenged statements in the "Investigative Notes" caused Blackmon's guilty plea and incarceration, the Complaint expressly, and repeatedly, pins his deprivation on the statements that Blackmon, himself, actually made during his meetings with Holder and Munday:

The *only* evidence against Blackmon were false inculpatory statements *he made* that were the product of the defendants' intentional and deliberate exploitation of his severe mental illness, delusional disorder, and intellectual disability. (J.A. 13, ¶ 2.) (emphasis added).

The *only* 'evidence' connecting Blackmon to the crime was his so-called '*confession*.'" (J.A. 18, ¶ 30.) (emphasis added).

Upon information and belief, *but for Holder and Munday's conduct in fabricating a false confession from James Blackmon*, James Leach would have been arrested and convicted of the murder of Helena Payton … (J.A. 70, ¶ 251.) (emphasis added).

Defendants Holder and Munday deliberately fabricated evidence by feeding Blackmon facts about the attack on Helena Payton … and by exploiting the mental illness of James Blackmon *to cause him to make false admissions* of his involvement in the murder of Helena Payton … (J.A. 71, Count I, ¶ 255.) (emphasis added).

Any reasonable law enforcement in 1983 would have known— and these defendants did know— that the tactics used *to obtain false admissions from James Blackmon* were improper, coercive, and highly likely to generate false statements. (J.A. 71, Count I, ¶ 258.) (emphasis added).

The arrest, prosecution, conviction, and confinement of James Blackmon was deliberately and purposefully brought about by defendants Holder and Munday and was the obvious and intended result *of their manipulative interrogation of Blackmon*. (J.A. 72, Count I, ¶ 261.) (emphasis added).

Count II - 42 U.S.C. § 1983 - Deprivation of Liberty and Denial of Substantive Due Process in Violation of the 14th Amendment (*Use of Psychologically Manipulative Interrogation Techniques*). (J.A. 72-77, Count II, ¶¶ 265-289.) (emphasis added).

The Complaint's factual detail concerning Blackmon's conviction only implicates the statements he actually made to Holder and Munday as the cause of his guilty plea:

35

Blackmon's attorney, Thomas Manning, filed a motion to suppress ***the statements obtained*** by Holder and Munday … That motion was denied on August 31, 1987. (J.A. 65, ¶ 228.) (emphasis added).

After that motion to suppress had been denied, Manning advised Blackmon that he was going to be convicted of first-degree murder at trial … (J.A. 65, ¶ 229.)

Manning advised Blackmon to accept the state's offer to plead guilty to second degree murder … He also advised Blackmon that he would preserve for appeal the admissibility of ***the statements obtained*** by Holder and Munday. (J.A. 65, ¶ 231.) (emphasis added).

Blackmon … decided to follow Manning's advice and plead guilty to second degree murder, provided he would not say that he had killed Helena Payton, and that the appeal of the motion to suppress was preserved. (J.A. 65-66, ¶ 232.)

The Court of Appeals decision reviewing the trial court's denial of the motion to suppress confirms that "the statements obtained" by Holder and Munday were the tape-recorded conversations, the statements Blackmon made during the October 25, 1983 visit to St. Augustine's, and the unchallenged statements in the "Investigative Notes"— *i.e.*, Blackmon's identification of the bathroom stall in which Ms. Payton was attacked and his statement that he washed his hands in the sink afterwards. *Blackman*, 93 N.C. App. at 208-209, 377 S.E.2d at 291. The decision makes no reference to the two statements that Appellant now contends were fabricated whole cloth by the detectives.

Appellant's argument that Holder and Munday attributed statements to Blackmon that he did not make is contradicted by his own allegations. Further, any such statements, if determined to have been fabricated, were neither the but for nor

36

proximate cause of Blackmon's deprivation of liberty. As Appellant himself argues, the only result of these alleged fabrications was "apparently to justify exposing [Blackmon] to the scene of the crime before asking him any questions about it." (Appellant's Br. 39, ECF No. 23). Accordingly, any federal individual-capacity claims premised on this particular "fabrication" assertion, fail as a matter of law.

## II.    THE COMPLAINT DOES NOT PLAUSIBLY PLEAD A "RECKLESS FABRICATION AND/OR USE OF FALSE EVIDENCE CLAIM."

While it is true that "reckless disregard for the truth" can be a basis for sustaining a due process claim, the Appellant's Complaint alleges facts that contradict this theory. For instance, Holder and Munday had inculpatory information about Blackmon prior to the interviews that resulted in his confession.

Under the overstated heading "The Uncorroborated Dix Information," the Complaint discloses that another detective in the Raleigh Police Department received a tip from a source in Dorothea Dix Hospital that an individual admitted to the hospital had "mentioned the murder of a black female at St. Augustine College… [t]he suspect talked about murdering other black females in Wake County [North Carolina] (at least three) and at least two (2) murders in New York and New Jersey… The suspect was supposed to have been very graphic in his description of how he killed these women…" (J.A.31.)  The source believed the name of the suspect started with the letter B. (J.A.32.)  The detective "contacted a second source at Dix," who "reported that the only subject who fit the criteria was James Blackmon." (J.A.32.)

37

The detective learned that Blackmon had been previously incarcerated in both Wake County, North Carolina [*i.e.*, Raleigh] and at Attica in New York.  (J.A.32.)  These are the same geographic locations in which the original source indicated Blackmon had bragged about committing other murders.

Subsequent to their colleague learning such information from his informant, Holder and Munday showed an eyewitness to the murder, Jacqueline Kelly, a photo array containing a photo of Blackmon.  Kelly pulled Blackmon's photo aside, along with the photo of a man named Barry Chavis, commenting that "these two looked like they could possibly be the suspect."  (J.A.39.)  Appellant overemphasizes the failure of Kelly to ***positively*** identify Blackmon in the photo array where she is alleged to have commented that Blackmon "looked heavier" in 1983 than the perpetrator did in 1979.  (J.A.39.)  Without the benefit of hindsight nearly forty years after the fact, these facts do not eliminate Blackmon as a suspect nor do they negate the fact that Kelly pulled Blackmon's photograph. This, in addition to the other information known about Blackmon from Dix Hospital, was consistent with Blackmon's development as a suspect at the time he was interviewed.

The detectives could not have had a "high degree of awareness of [Blackmon's inculpatory] statement's probable falsity," *Miller v. Prince George's Cty., Md.*, 475 F.3d 621, 627 (4th Cir. 2007), (1) without actually knowing that

Blackmon was innocent and (2) given the existence, at that time, of other inculpatory evidence.

To support his "reckless disregard" theory of liability, the Appellant ignores the above inculpatory evidence and directs the Court to his allegations of Holder and Munday's (1) knowledge of exculpatory evidence as to Blackmon and (2) calculated exploitative interrogation tactics, which, as Appellant asserts, the detectives knew were likely to result in a false confession.  (Appellant Br. 45, ECF No. 23.) However, the North Carolina Court of Appeals vindicated the detectives' interrogation tactics over three decades ago. *Blackman*, 93 N.C. App. at 211, 377 S.E.2d at 293.

Moreover, Holder and Munday are not alleged in the Complaint to have had any special ability to assess Blackmon's competency.  The North Carolina Court of Appeals, though, addressed Blackmon's claimed incompetency at the time he confessed, by summarizing evidence before the trial judge, and therefore capturing the totality of the circumstances presented to Holder and Munday on the characteristics of the accused:

> In our view, some of the medical and other evidence in this case would support a conclusion that this defendant was not competent when he spoke with the detectives.  At the same time, other competent evidence in this record points to the opposite conclusion.  Conflicting evidence does not vitiate the conclusive and binding effect of the trial judge's findings on the appellate court.

93 N.C. App. at 213, 377 S.E.2d at 293.

Whether this Court agrees with the state appellate court or the state trial judge—or, for that matter, the forensic psychiatrist who testified for the State—is not the object of this argument. However, if a trial court judge ruled that Blackmon was competent to confess to Holder and Munday, based on the expert testimony and professional opinion of a forensic psychiatrist, and then an appellate court affirmed the competency determination—how could two police officers in 1983 be expected to have arrived at any different conclusion? Worse, how could these two police officers be held individually liable almost four decades later for conduct that was endorsed by a trial court and an appellate court of that time?

There simply was no contrary authority directing the Court of Appeals in 1989, and certainly none directing Holder and Munday in 1983, to support the Complaint's unadorned allegation that "defendants did know—that the tactics used in interrogating Blackmon were… highly likely to generate a false confession." (Appellant Br. 45, ECF No. 23; J.A.75.) As such, the factual allegations do not identify, and as a matter of law Holder and Munday could not have had, the "reckless" state of mind required to state a claim under § 1983.

Appellant contends that the District Court erred in concluding that he only pled "a negligent mental state" even where "the complaint alleges defendants Holder and Munday 'reasonably should have known' plaintiff was innocent …" (J.A.117.) According to Appellant, the District Court "gave…far more weight to [the Dorothea

Dix] 'tips' than the clearly exculpatory evidence of which the Defendants were aware." (Appellant Br. 47, ECF No. 23.)

Appellant complains that the lower court relied on the alleged inculpatory evidence concerning the Dorothea Dix sources but disregarded Appellant's allegation that Holder and Munday did not identify the sources, confirm their reliability, or otherwise investigate such sources. (Appellant Br. 47, ECF No. 23.) One is left to wonder, however, what reasonable inference is to be derived from such an allegation. Appellant does not tell us, and that is because such an allegation does not lead to a reasonable inference of reckless conduct, particularly given the inculpatory Kelly photo array (J.A.39), which was then followed by Blackmon's own inculpatory statements (J.A.46-61).

The District Court's February 3, 2022 Order simply makes the point that *the officers* (*i.e.*, not the Court itself) "crediting inculpatory over exculpatory evidence does not amount to a 'willingness to affirmatively distort the truth.'" (JA370) (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3rd Cir. 2000)). The District Court summarized the exculpatory evidence alleged in the Complaint, and noted that "[t]aking those allegations to be true, plaintiff's complaint nevertheless also includes evidence suggesting his guilt." (J.A.370.) After also summarizing the inculpatory evidence alleged in the Complaint, the District Court concluded that:

> In light of the presence of both alleged inculpatory and exculpatory evidence, it is not plausible to infer that, by pursuing plaintiff's

confession and subsequently using it to prosecute him, defendants were acting dishonestly or otherwise attempting to distort the truth.

(J.A.371.)

To support its conclusion, the District Court cited to *Massey v. Ojaniit*, 759 F.3d 343, 355 (4th Cir. 2014) ("That an eyewitness described an assailant as having braids does not, by operation of nature or law, exonerate all suspects who do not have braids; it merely calls into question that aspect of the description as applied against anyone not wearing braids.") The District Court's reference to this Court's opinion in *Massey* is instructive. Just as this Court endorsed in *Massey*, the District Court accurately considered whether the exculpatory evidence known to the officers affirmatively *excluded* Blackmon as a suspect. (*See*, *e.g.* J.A.371) ("...[A]s the [other of Blackmon's] arrests did not actually overlap with the time of the assault, the records did not necessarily exclude plaintiff as a suspect."). The Complaint does not contend, nor can Appellant plausibly contend now, that any of the exculpatory evidence known to the detectives as of the time of the confession affirmatively excluded Blackmon from having murdered Helena Payton.

Therefore, the only plausible conclusion the Court can draw is that Holder and Munday were confronted with competing inculpatory and exculpatory evidence prior to interviewing Blackmon—and then Blackmon made inculpatory statements during said interview—an interview that was found to be lawful by the North Carolina Court of Appeals in 1989. As such, the District Court's conclusion that "it

is not plausible to infer that, by pursuing plaintiff's confession… defendants were acting dishonestly…" (J.A.371) is entirely appropriate, and certainly not an abuse of the District Court's discretion.

Additionally, Appellant's attempt to analogize the facts of this case to *Humbert v. Mayor and City Council of Baltimore City*, 866 F.3d 546 (4th Cir. 2017) is truly an act of trying to force a square peg through a round hole. Appellant's own brief reveals this:

> The Fourth Circuit ruled that the officers made a false representation about the evidence when they asserted in the warrant application that the 'victim positively identified Humbert as her attacker.' And the Court ruled that the 'inclusion of this false statement amounts to at least recklessness…"

(Appellant Br. 49, ECF No. 23) (quoting *Humbert*, 866 F.3d at 557).

In *Humbert*, the defendant-officers made affirmative misrepresentations in sworn testimony, just as in *Washington II*, but unlike the allegations in this case. The day after her attack, "during or after" a meeting with an officer to generate a composite sketch of the victim's assailant, an officer "showed [the victim] a photo on his cellphone of a man he identified as her attacker."  866 F.3d at 551.  Some days later, after two photo arrays failed to elicit an identification, officers presented the victim with another photo array, this time including Humbert's photograph.  *See id*.

While "[t]he victim wrote 'that's him' on the back of the photo [of Humbert] and signed her name," "[s]he then informed [the officers] that she could not positively identify Humbert as her assailant because she needed to see him in a physical lineup and hear his voice." 866 F.3d at 551-52. The officers subsequently stated in a warrant application, "…the victim positively identified him as her attacker," which was false according to the jury's findings in response to juror interrogatories. *Id.* at 556. Instead, the victim simply had an emotional response to seeing a photograph of a person that resembled her attacker (*i.e.*, Humbert) but subsequently withdrew her positive identification. This Court concluded that "[i]t is clear that the probable cause supporting the Officers' application was based primarily, if not entirely, on the false assertion that the victim positively identified Humbert." *Id.* at 557.

There is no analogous "false assertion" by Holder and Munday which Appellant identifies as having formed the basis of probable cause here. Appellant simply contends, incorrectly, that the holding in *Humbert* would extend to Holder and Munday's alleged interview tactics as a basis for reckless conduct. However, the reckless conduct that was the object of the Court's analysis in *Humbert* was ***not*** the officer-- for example-- showing a photograph to the victim prior to the photo array, but rather, the false and un-caveated assertion in the warrant application that

44

the victim positively identified Humbert. Accordingly, like the other cases selectively quoted by Appellant in his Brief, *Humbert* is entirely inapposite.

The District Court did not err in concluding that, at worst, Appellant alleged merely "a negligent state of mind" by Holder and Munday for which § 1983 liability will not attach.

## CONCLUSION

Appellant's federal constitutional claims constitute an attempted evasion from the inevitable immunity afforded to Holder and Munday for any coercive tactics in their interviews of Blackmon that resulted in his own confession. However, in attempting such evasion and instead opting for a "deliberate fabrication" label for his claims, Appellant runs into the wall of his own allegations concerning (1) Holder and Munday's belief in Blackmon's guilt and (2) statements actually made by Blackmon that support the challenged statements in the officers' "Investigative Notes," which block the very claims Appellant seeks to bring. Moreover, Appellant's contention that the detectives unconstitutionally failed to abort their pursuit of Blackmon's confession in the face of competing exculpatory and inculpatory evidence fails to state a cognizable § 1983 claim.

Based on this, and all of the foregoing arguments, Appellees respectfully request that the Court AFFIRM both (i) the District Court's Order granting Holder and Munday's Motions to Dismiss as to the § 1983 claims brought against them in

their individual capacities (J.A.101-119) and, to the extent Appellant seeks relief

therefrom, (ii) the District Court's Order denying Blackmon's Motion to Modify

(J.A.364-376.)

Respectfully submitted this 3rd day of June 2024.

/s/ Jason R. Benton
Jason R. Benton
N.C. Bar No.: 27710

/s/ Daniel E. Peterson
Daniel E. Peterson
N.C. Bar No.: 41521

/s/ Caroline B. Barrineau
Caroline B. Barrineau
N.C. Bar No.: 51571
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
Telephone: 704-372-9000
Facsimile: 704-334-4706
Email: jasonbenton@parkerpoe.com
Email: danielpeterson@parkerpoe.com
Email: carolinebarrineau@parkerpoe.com

Attorneys for Defendant-Appellee James Holder

/s/ Sonny S. Haynes
Rachel E. Keen
N.C. State Bar No. 27777
Sonny S. Haynes
N.C. State Bar No. 41303
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
Telephone: (336) 721.3569
Email:  rachel.keen@wbd-us.com
Email:  sonny.haynes@wbd-us.com

Attorneys for Appellee Andrew Munday


/s/ Norwood Pitt Blanchard, III
Norwood Pitt Blanchard, III
N.C. State Bar No. 26470
CROSSLEY MCINTOSH COLLIER HANLEY
   & EDES PLLC
5002 Randall Parkway
Wilmington, North Carolina 28403
Telephone: (910) 762.9711
Email:  norwood@cmclawfirm.com

Attorneys for Appellee City of Raleigh

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certify that they are the attorneys representing the Defendant-Appellants and that this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-pt. type and Times New Roman.  Using the word count feature of the software used to prepare the brief, it was determined that the text of the brief (excluding the cover page, disclosure statements, table of contents, table of authorities, request for oral argument, signature block, and certificates of counsel) contains 10,992 words.

June 3, 2024.

/s/ Jason R. Benton
Jason R. Benton
N.C. Bar No.: 27710

/s/ Daniel E. Peterson
Daniel E. Peterson
N.C. Bar No.: 41521

/s/ Caroline B. Barrineau
Caroline B. Barrineau
N.C. Bar No.:  51571
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
Telephone: 704-372-9000
Facsimile: 704-334-4706
Email:  jasonbenton@parkerpoe.com
Email:  danielpeterson@parkerpoe.com
Email:  carolinebarrineau@parkerpoe.com

*Attorneys for Defendant-Appellee James Holder*

48

/s/ Sonny S. Haynes
Rachel E. Keen
N.C. State Bar No. 27777
Sonny S. Haynes
N.C. State Bar No. 41303
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
Telephone: (336) 721.3569
Email:  rachel.keen@wbd-us.com
Email:  sonny.haynes@wbd-us.com

*Attorneys for Appellee Andrew Munday*

/s/ Norwood Pitt Blanchard, III
Norwood Pitt Blanchard, III
N.C. State Bar No. 26470
CROSSLEY MCINTOSH COLLIER HANLEY
  & EDES PLLC
5002 Randall Parkway
Wilmington, North Carolina 28403
Telephone: (910) 762.9711
Email:  norwood@cmclawfirm.com

*Attorneys for Appellee City of Raleigh*

49